Joseph JONES, Jr. and Beverly Jones, by their Next Friend, Joseph Jones, Plaintiffs,

v.

Phillip SCIACIA and Frances Sciacia, Defendants.

No. 68 C 471(1).

United States District Court
E. D. Missouri, E. D.
March 14, 1969.

Samuel H. Liberman, Kramer, Chused & Kramer, St. Louis, Mo., for plaintiffs.

Earl L. Davis and Granville Gamblin, St. Ann, Mo., James T. O'Brien and Stephen H. Gilmore, St. Louis, Mo., for defendants.

## MEMORANDUM OPINION

HARPER, Chief Judge.

Plaintiffs, by next of friend, have instituted this action seeking injunctive, compensatory and punitive relief for an alleged violation of the statutory command contained in 42 U.S.C.A. § 1982. Jurisdiction is founded upon 28 U.S.C.A. § 1343(4). The case, in essence, deals with alleged racial discrimination in the rental of an apartment owned by the defendants and located at 8717 Natural Bridge, in St. Louis, Missouri.

Section 1982 provides:

"All citizens of the United States shall have the same right * * * as is enjoyed by white citizens thereof to * * * lease * * * property."

While this section does not specifically mention rental, it is quite clear that the rental of apartment units is within the purview of its command. Jones v. Alfred Mayer Co., 392 U.S. 409, 413, 88 S.Ct. 2186, 20 L.Ed.2d 1189. The plain language of the section requires that it encompass every racially motivated refusal to rent. Jones v. Alfred Mayer Co., supra, at 421, 88 S.Ct. 2186.

The crucial issue, therefore, is: Was the refusal of the defendants to rent to the Joneses racially motivated, that is, did the defendants so act as to deny to the Joneses the same rights as enjoyed by white citizens in the rental of this property?

In dealing with racial discrimination one is dealing with a state of mind which may or may not be mani-fested by overt acts. Often, as in the case of a consistent pattern of acts, the state of mind is clearly revealed. However, in the instant case, we are not confronted with a pattern of acts. The defendants own three apartment buildings. Two are located on the same lot at 8717–8720 Natural Bridge, while the third is located in the Pine Lawn area. None of these apartments are now rented, nor have they ever been rented to Negroes. However, from the evidence before this court, such a situation is as consistent with the proposition that the Joneses are the first Negroes to apply as with any other interpretation. Therefore, the court must proceed on the basis that there is no proven pre-existing pattern of racial discrimination and rely solely upon the events surrounding the refusal of the defendants to rent to the Joneses on the 23rd and 24th of October, 1968.

This suit was originally filed by Joseph Jones and Beverly Jones on November 7, 1968, and an order to show cause seeking a preliminary injunction was filed at the same time the hearing on which was set for trial on November 15, 1968. On November 15th, the parties by agreement continued the hearing on the preliminary injunction, merged it with the hearing on the permanent injunction, and the matter was set for trial on the merits for January 2, 1969.

Thereafter, on December 3rd, the plaintiffs filed a motion to amend the complaint by adding the abbreviation "Jr." after the name, "Joseph Jones", as plaintiff, and sought the appointment of a next friend since Joseph Jones, Jr. and Beverly Jones were each under the age of 21, and Joseph Jones was added as the next friend for Joseph Jones, Jr., and Beverly Jones, to bring the suit.

The court in examining the pleadings when the petition for the appointment of the next friend was filed by Joseph Jones, Jr., and Beverly Jones, noted the apparent difference in the signature of Joseph Jones, Jr., on the petition for appointment of a next friend and the signature of Joseph Jones as it appeared on

the affidavit filed with the complaint, which affidavit was subscribed and sworn to before Samuel H. Liberman, the attorney, and the court inquired of Joseph Jones, Jr., and his wife, Beverly Jones, at the beginning of the trial as to whether or not they had signed the affidavits attached to the original complaint before Samuel H. Liberman on November 4, 1968, and was advised that Beverly Jones signed the affidavit at home and that Joseph Jones, Jr., took the affidavit to Mr. Liberman and delivered it to him at his office. Joseph Jones, Jr., wanted to know what difference it made anyway. The court permitted the substitution of Joseph Jones as next friend, but the testimony with respect to the affidavits becomes somewhat pertinent as to credibility, because in the depositions taken on December 26th before the trial on January 2nd Joseph Jones, Jr., swore he had not seen Liberman, his attorney, until about one week before the taking of the deposition.

The credible evidence presented to the court establishes that the refusal on the part of the defendants to rent to the Joneses was not motivated by any racial factor, but rather was due solely to the fact that there was no vacancy then and there existing.

Chronologically, the following events led up to the inability of the Joneses to obtain the apartment:

(1) On September 11, 1968, a Mrs. Sue Henderson gave the defendant, Mrs. Frances Sciacia a fifty-dollar deposit as security for the rental of an apartment. At this time, Mrs. Sciacia contemplated that Unit B on the 8717 side would be available at the time that Mrs. Henderson required an apartment. Mrs. Henderson's husband was due to be released from service with the Armed Forces around the 1st of November and Mrs. Sciacia had begun eviction proceedings against the present tenants of Unit B and expected it to be available at about that time. It should be noted that Mrs. Henderson was not particular about which of the eight units she rented since all eight are substantially identical.

Mrs. Sciacia and Mrs. Henderson agreed that the deposit would be returned in the event that no vacancy occurred.

(2) On or about October 5, 1968, a vacancy did occur in Unit D on the 8720 side. Mrs. Sciacia did not contact Mrs. Henderson about this unit, still having Unit B in mind. A couple by the name of Talbert moved into Unit D and Mrs. Talbert shortly thereafter began to show her apartment to prospective tenants for Mrs. Sciacia.

(3) In mid-October the couple in Unit C on the 8717 side gave Mrs. Sciacia notice that they were being transferred to New York and so were going to vacate. The evidence indicates that no specific date was given as to the date the apartment would be vacated. However, their rent was paid until the 1st of November and Mrs. Sciacia logically assumed that they would leave on about that date. Shortly after receiving this notice, Mrs. Sciacia placed or had a "for rent" sign placed at the 8717–20 complex. The rent sign was used not only to rent apartments at that location, but also for apartments at the Pine Lawn location.

(4) On October 16, 1968, the plaintiffs were married and began in earnest their search for an appropriate apartment. Their search centered in the Pine Lawn, Normandy and Natural Bridge areas, although some looking was done elsewhere.

(5) On Monday, October 21, 1968, Mrs. Henderson called Mrs. Sciacia and inquired into the availability of a unit. Mrs. Sciacia did not mention the forthcoming vacancy in Unit C because she still intended to give Unit B to the Hendersons.

(6) On that same day, one Timothy G. Phillips, seeing the "for rent" sign, inspected the Talberts' apartment and spoke with Mrs. Talbert. Mr. Phillips was in the company of another young man who was to room with Phillips until January, at which time Phillips was to be married. Later that day, Phillips went to see Mrs. Sciacia. Mrs. Sciacia informed him that there would be a vacancy shortly in Unit C. Mrs. Sciacia

would not take the deposit until Phillips had inspected the apartment with his fiancée.

(7) On October 23, 1968, the Joneses saw the "for rent" sign and went in to investigate. They located the Talberts' apartment and were shown it. Mrs. Talbert informed them that there was going to be a vacancy and called Mrs. Sciacia. Mrs. Sciacia told Mrs. Talbert to send them over to her home. Mrs. Talbert testified that she told Mrs. Sciacia that the Joneses were Negro and that Mrs. Sciacia asked if they were neat and upon receiving an affirmative answer told her to send them over. Mrs. Sciacia does not recall any mention of race. The Joneses proceeded to the Sciacia home. Mr. Jones testified on direct that when they arrived Mrs. Sciacia told them that her husband had just rented the apartment and that she was sorry, but on cross-examination his memory was improved by reference to his deposition, and he testified that Mrs. Sciacia said something to the effect that an apartment would be available later and to come back. He was unable to say whether Mrs. Sciacia referred to another apartment. Mrs. Sciacia testified that she told the Joneses that there was no vacancy at the apartment. At this time she had both Mr. Phillips and Mrs. Henderson in mind. Further, she testified that she offered to rent Jones a one-bedroom apartment in Pine Lawn which would be available around the 1st of November.

In trying to ascertain exactly what occurred at this meeting the court must take into account the credibility of the witnesses. Mr. Jones revealed at best a faulty memory and little weight can be given to the details as he explains them. For instance, Mr. Jones during the course of his testimony at the trial gave three different responses to questions concerning the time at which he had first seen his attorney. If this and other similar instances do not cast sufficient doubt, Mr. Jones further admitted that at his deposition, taken under oath, many of his answers were not true. On the other hand, from the evidence in the record there is little, if anything, to contradict Mrs. Sciacia. Weighing their testimony, the court has no alternative other than to accept her version. That version is substantiated by the fact that the plaintiffs' evidence as well as the defendants', show there was no vacancy at the 8717–20 complex. First, the tenants in C had not yet vacated and no one knew when they would do so. Second, Mrs. Sciacia had a deposit from Mrs. Henderson, which clearly gave her some priority although she was tabbed for Unit B. Third, Mr. Phillips had, from a practical business point of view, first call on Unit C after Henderson, but before the Joneses. It is further clear from the evidence presented that the Joneses did not leave their address or phone number with Mrs. Sciacia, nor did they offer her a deposit or any rent for any apartment at any time, then or later.

(8) Mrs. Talbert testified that shortly after the Joneses returned to her place from the Sciacias', Mrs. Sciacia called her and, laughing, told her not to send any Negroes over. Whether or not that conversation in fact occurred does not add to the plaintiffs' case in view of what happened on the next day, October 24th.

(9) On the 24th, Mrs. Talbert, through a friend, got in touch with Mr. Sporleader at an organization known as Freedom of Residence. He contacted the Joneses. The Joneses were inspired by this call to take action.

At about 11:40 a. m., a Mrs. Goldstein, a volunteer worker at Freedom of Residence, called the defendants' phone number and spoke to someone identifying herself as Mrs. Sciacia. According to Mrs. Goldstein, Mrs. Sciacia told her she had a one and a two-bedroom available for immediate rental, but all of the testimony conclusively shows no vacancy existed.

Sometime after this call, Mrs. Sciacia was called on the telephone by Mr. Sporleader, who threatened her and ordered her to rent to the Joneses and threatened suit if she did not. Mrs. Sciacia ex-

plained that she did not in fact have a vacancy. Sporleader gave her the Joneses' phone number. Immediately, Mrs. Sciacia called the Joneses and told Mr. Jones that she had not rented to him solely because of a lack of vacancy and not because he was a Negro. She also told him to tell that to his attorney. She then repeated her offer to rent him the Pine Lawn apartment and further told him that if they would come over and leave their names and address she would rent them the next available apartment at the Natural Bridge address. The Joneses never returned.

Mrs. Sciacia then called Sporleader and related her conversation with the Joneses, but Mr. Sporleader told her that it was too late, that suit would be filed.

Jones admits that the conversation with Mrs Sciacia took place. He admits that she gave the reason for the refusal but did not recall and would not say if any of the rest of the conversation took place. All of the circumstances support the version of the conversation given by Mrs. Sciacia.

Later, on the evening of the 24th, Mr. Phillips came to see Mrs. Sciacia. She told him that some Negroes wanted the apartment badly and he thereupon paid his deposit which Mrs. Sciacia agreed not to cash until he paid the rest of the rent.

During the next two days, according to Mrs. Talbert's testimony, Phillips saw Mrs. Talbert, who related to him and to the companion who was to live there until the marriage what Sporleader had told her to say, namely that he should not take the apartment since he would be evicted if they won the suit. The events clearly indicate that Phillips was effectively scared off by Sporleader, and on Saturday the 26th, Phillips told Mrs. Sciacia that he would not take the apartment. Since the tenants moved out on the 25th, and the vacancy occurred on that day, and since the tenants in B had not yet been evicted, Mrs. Sciacia called Mrs. Henderson and gave her Unit C.

The evidence in the record rather clearly indicates that the Joneses were not given the apartment in question for the reason that others were there first and because he did not care enough to wait in line like the rest. There was no vacancy when Jones inquired. The vacancy occurred later and the person to whom it was rented had applied prior to the Joneses. It is, therefore, the opinion of this court that from the evidence contained in the record, the refusal of the defendants Sciacias to rent to the Joneses was not racially motivated, but rather that the Joneses were treated like all other prospective tenants. This being the case, the plaintiffs have failed to carry the burden of proof.

The court adopts this memorandum opinion as its findings of fact and conclusions of law. The clerk will prepare and enter the proper order giving judgment to the defendants and against the plaintiffs, and dismissing their cause of action with prejudice. Costs will be taxed against the plaintiffs.