415 F.Supp. 633 (1976)
Ferdinand D. WHARTON, Jr., Plaintiff,
v.
Frances N. KNEFEL, Defendant.
No. 75-718C(3).
United States District Court, E. D. Missouri, E. D.
May 26, 1976.
Robert H. Kubie, St. Louis, Mo., for plaintiff.
J. Dennis O'Leary and Wm. B. Smith, Dubail, Judge, Kilker & Maier, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This action is before the Court for a decision on the merits following the trial to the Court sitting without a jury.
This action was brought by the plaintiff, Ferdinand D. Wharton, Jr., against the defendant, Frances N. Knefel, for alleged violations of 42 U.S.C. §§ 1982 and 3604 for racial discrimination in the rental of housing. Plaintiff seeks actual damages, punitive damages, attorneys fees and injunctive relief. The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

*634 Findings of Fact

1. Plaintiff is a fifty six (56) year old black male who is divorced, with four sons, one of whom is emancipated and living in another city, the remaining three sons are in their twenties or late teens, at various stages of their high school and college educations. For approximately ten years, plaintiff has been an executive with the Monsanto Company. Prior to his employment with Monsanto Company, the plaintiff was employed by the United States Department of State serving as an agricultural consultant to the Agency for International Development in Ghana. The plaintiff has a bachelor's degree in agricultural education and a master's degree in nutrition.
2. The defendant is a white female who owns and manages apartment buildings in St. Louis County, Missouri, which have the address of 7533 Parkdale, 7510 Parkdale, 7514 Buckingham, and 7507 Wellington Way. The defendant is a tenant by the entirety in an apartment building at 7537 Parkdale which is co-owned and managed by her husband. There are twenty-three apartment units in the buildings owned and managed by defendant.
3. On or about the date of August 4, 1975, the defendant had available for rental a two bedroom apartment on Buckingham for two hundred and eighty dollars ($280.00) per month, and a three bedroom apartment at 7533 Parkdale, more specifically apartment 2-E, for three hundred and twenty-five dollars ($325.00) per month.
4. During August of 1975, the plaintiff was attempting to find a larger apartment than the two bedroom apartment he was presently occupying. Some of the reasons for the plaintiff desiring a new apartment were that his former wife had indicated an intention to leave the Country, which would mean that the plaintiff's sons would be spending more of their time residing with the plaintiff. Plaintiff had also determined that he would like to live in an area in Clayton, Missouri, commonly known as the Moorlands.
5. While driving through the Moorlands area during the first week of August, 1975, the plaintiff observed a sign reading "for rent 3-4 bedrooms, 2 baths, 863-6034". This sign was posted in front of 7537 Parkdale, a building owned jointly by the defendant and her husband in which they reside.
6. The plaintiff and defendant first contacted each other by telephone on August 8, 1975.
7. On or about August 10, 1975, the plaintiff, along with a female companion, went to the defendant's apartment in order to inspect the available unit. The plaintiff did not have a definite appointment with the defendant and the defendant was not at home, having taken her husband to the hospital. Plaintiff gave the defendant's daughter his business card and asked the daughter to tell the defendant that he had stopped by.
8. On the evening of August 10, 1975, the plaintiff called the defendant and inquired about the availability of the three bedroom apartment. The defendant told the plaintiff that another party was interested in the apartment and that if this party were not accepted she would contact him in the future.
9. At no time had the plaintiff met the defendant, and the two parties did not in fact meet until after the instant lawsuit was filed.
10. At the time defendant stated to plaintiff that another party was interested in the apartment in question, defendant had decided that the plaintiff would not be a suitable tenant for several reasons. These reasons were that: the defendant had encountered bad experiences on previous occasions in which she had rented to divorced men; the defendant had also suffered a large financial loss due to the unsupervised teenage child of a previous divorced woman tenant; the defendant also considered the plaintiff an unsuitable tenant because of the likelihood that the defendant's sons would have free access to the apartment while he was travelling on business.
11. On the morning of August 11, 1975, the plaintiff contacted Ms. Hedy Epstein of *635 the Greater St. Louis Freedom of Residence Committee and asked her organization to check to determine whether or not the apartment was available.
12. Ms. Epstein called the defendant and made an appointment to see the apartment using the fictitious name of "Betty Stone". Ms. Epstein visited the apartment accompanied by another Freedom of Residence checker, Susan Chapman, who posed as Ms. Epstein's daughter.
13. At the time Ms. Epstein was being shown the apartment by the defendant, Ms. Epstein was informed of prior interest in the apartment by other tenants.
14. Ms. Epstein inquired as to whether or not Mrs. Knefel rented to black persons. The defendant then informed Ms. Epstein that no blacks had applied to live in any of her apartments.
15. It is clear from the testimony of both Mrs. Knefel and Ms. Epstein that the remarks of Ms. Epstein regarding whether or not the defendant rented property to black persons were of a highly leading and suggestive nature. The essence of Ms. Epstein's remarks was an attempt to "egg-on" the defendant into making a statement against her interest. The whole purpose of Ms. Epstein's visit was to "manufacture" evidence which could be used to bludgeon the defendant into taking the action that had been decided as proper by Ms. Epstein, and Ms. Epstein alone. In contrast, the answers given by the defendant to Ms. Epstein are in the opinion of this Court very non-committal and non-incriminating as to race discrimination.
16. Upon the return of Ms. Epstein, Susan Chapman and the defendant to the defendant's apartment, Ms. Epstein affected to have forgotten her checkbook. The defendant gave Ms. Epstein (posing as "Mrs. Stone") an application to fill out, stating that she could mail it back with her check for the first month's rent. Mrs. Knefel wrote her name and telephone number on the bottom of the application together with the number of the apartment in question.
17. The conversation between the defendant and Ms. Epstein was supposedly reduced to writing after the check visit of Ms. Epstein and Susan Chapman. The Court notes with interest that plaintiff's Exhibit 1, the written summary of the conversation varies from Ms. Epstein's testimony and those portions of the conversation which are of benefit to the defendant are scratched out in Ms. Epstein's written summary so that Ms. Epstein's preconceived ideas as to the conduct of the defendant might be proved.
18. On the following morning of her visit to the apartment in question, Ms. Epstein telephoned the defendant and stated she was in reality Ms. Hedy Epstein of the Greater St. Louis Freedom of Residence Committee, and that she believed that the defendant had refused to show apartment 2-E, 7733 Parkdale, to the plaintiff on the basis of plaintiff's race; that such a refusal to show the apartment might involve violations of federal and state laws; and that she would urge Mrs. Knefel not to rent the apartment to anyone else until the matter had been resolved.
19. This telephone conversation between Hedy Epstein and the defendant was reduced to writing in a letter admitted into evidence as plaintiff's Exhibit 2. The Court notes that the letter is in variance with the previous testimony of Ms. Epstein as to what occurred when she was posing as "Betty Stone". It again appears that Ms. Epstein is attempting to alter the facts so that any of the plaintiff's possible defenses will be abrogated. The plaintiff's Exhibit 2 is totally at variance and is very impeaching of Exhibit 1. By the same token Exhibit 1 impeaches Exhibit 2. Such circularity problems abound in Hedy Epstein's testimony.
20. Due to the above enumerated inconsistencies in Ms. Epstein's testimony, and its variance with various written memorials of the conversations, the Court finds the testimony of Hedy Epstein to be totally lacking in credibility, and not worthy of any consideration. The Court further finds that Ms. Epstein's testimony was thoroughly *636 impeached by that of the defendant. The testimony of Ms. Epstein would be far more credible if it were not for her obviously preconceived attitudes as to the actions of the defendant, and her obvious attempts to alter the record so that it would conform with her preconceived notions.
21. The defendant testified that she would not have rented to "Betty Stone" since she felt she would not be a suitable tenant. Hedy Epstein is of the Caucasian race.
22. The defendant testified on her own behalf that she would be willing to rent to black persons, and that she had shown one of her apartments to one Elise Woods, approximately one year before the incident from which this lawsuit arises took place.
23. The deposition testimony of Elise Woods clearly establishes to the Court that Ms. Woods was offered an apartment by the defendant. Ms. Woods testified at her deposition that the only reason she did not take the apartment was that it had one bath only, and since she had an invalid mother, that she needed two bathrooms.
24. The plaintiff has urged that due to Elise Woods' light complexion and hair color, that the defendant could have mistaken Ms. Woods as a white person. It was the opinion of the Court as the trier of fact after meeting Elise Woods, that she is unmistakably a black person and could not in any way be considered to be of the Caucasian race.
25. On August 17, 1975, Mr. and Mrs. Leonard Warren executed a two year lease for the apartment in question.
26. At the time of his first contact with the defendant, the plaintiff resided in a two bedroom apartment at another St. Louis area apartment complex. Even though his lease expired at the end of the month of August of the year in question, the plaintiff did not inspect any other apartment unit in any other location before or after having his limited contact with the defendant. As of September 5, 1975, the plaintiff signed another one year lease on the same two bedroom apartment at the apartment complex where he was living. It is clear to the Court that the plaintiff was not totally interested n acquiring a new apartment.
27. The apartment which plaintiff occupied at the time the alleged violations in question took place had a rental of three hundred dollars ($300.00) per month. The defendant's apartment unit rented for three hundred and twenty-five dollars ($325.00) per month. The Court finds that the plaintiff suffered no loss from any actions taken by the defendant.
28. After consideration of the matter, and after consideration of the testimony of all the witnesses, and all the evidence produced, it is the opinion of the Court that the plaintiff has failed to carry his burden of proof to show that he was discriminated against in the rental of housing by the defendant.

Conclusions of Law
The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 3612.
In an action such as the one presently at bar concerning racial discrimination in housing, the burden of proof is upon the plaintiff, Jones v. Sciacia, 297 F.Supp. 165 (E.D.Mo., 1969); aff'd 422 F.2d 393 (8th Cir., 1970).
As stated above in the findings of fact, the Court is of the opinion after carefully considering all the evidence, and the post-trial briefs and memoranda of counsel for the parties, that the plaintiff has simply failed to carry his burden of proof with regard to any discrimination.
It is noted that the defendant showed another apartment that she owned to a black woman approximately one year and a half before the incident in question.
The law does not allow plaintiff to be refused tenancy solely because of his race. It is equally clear that defendant, property owner, is not precluded from refusing tenancy for other good and sufficient reasons, not based upon race.
*637 As indicated in the findings of fact the activities of the Greater St. Louis Freedom of Residence Committee are by Ms. Epstein's own admission aimed at "making a case" and not at approaching the matter with an open mind.
These facts, coupled with the totality of the evidence, and the extremely low credibility of the plaintiff's witnesses, indicate to the Court sitting as the trier of fact that the judgment should be entered for the defendant and accordingly it will be so ordered.