**Ferdinand D. WHARTON, Jr., Appellant,**

**v.**

**Frances N. KNEFEL, Appellee.**

**No. 76–1498.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 15, 1977.

Decided Sept. 19, 1977.

Rehearing and Rehearing En Banc
Denied Oct. 13, 1977.

Robert H. Kubie, St. Louis, Mo., on brief for appellant.

J. Dennis O'Leary, Dubail, Judge, Kilker & Maier, St. Louis, Mo., for appellee; M. William Sitzer, St. Louis, Mo., Dubail, Judge, Kilker & Maier, St. Louis, Mo., on brief.

Before LAY and STEPHENSON, Circuit Judges, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

Plaintiff, a black resident of St. Louis, Missouri, brought this civil action charging racial discrimination in refusing to rent an apartment to him because of his race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982,[1] and the Civil Rights Act of 1968, 42 U.S.C. § 3604.[2] Jurisdiction is asserted under 28 U.S.C. §§ 1343(4) and 2201,[3] as well as under 42 U.S.C. § 3612.[4] In addition to injunctive relief, plaintiff sought compensatory and punitive damages, and reasonable attorney's fees and costs. The district court,[5] sitting without a jury, denied relief on the ground that "the plaintiff has simply failed to carry his burden of

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. 42 U.S.C. § 1982 provides:
   All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

2. 42 U.S.C. § 3604 provides in relevant part:
   [I]t shall be unlawful—
   (a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make available or deny, a dwelling to any person because of race, color, religion, or national origin.
   (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, or national origin.
   "Dwelling" as used in § 3604 is defined in 42 U.S.C. § 3602(b) as:
   (b) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

3. 28 U.S.C. § 1343 provides in relevant part:
   The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
   * * * * * *
   (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote.
   Neither the trial court nor the parties have discussed the application to this lawsuit of the declaratory judgment remedy, 28 U.S.C. § 2201, and we find it unnecessary to consider it in this decision.

4. 42 U.S.C. § 3612 provides in relevant part:
   (a) The rights granted by sections 3603, 3604, 3605, and 3606 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction. A civil action shall be commenced within one hundred and eighty days after the alleged discriminatory housing practice occurred: *Provided, however,* That the court shall continue such civil case brought pursuant to this section or section 3610(d) of this title from time to time before bringing it to trial if the court believes that the conciliation efforts of the Secretary or a State or local agency are likely to result in satisfactory settlement of the discriminatory housing practice complained of in the complaint made to the Secretary or to the local or State agency and which practice forms the basis for the action in court: *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under the provisions of this Act shall not be affected.
   * * * * * *
   (c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

5. Honorable H. Kenneth Wangelin, United States District Judge, Eastern District of Missouri.

proof with regard to any discrimination."[6] The sole issue on this appeal is whether the district court's finding is clearly erroneous. We reverse and remand for further proceedings.

At the time of trial, the plaintiff was 56 years of age and had been an executive of the Monsanto Company in St. Louis for the past eleven years. Living in a two bedroom apartment in University City, he had become dissatisfied with his living conditions partially because of the noise from a nearby highway, and partially because he was in need of larger quarters because of recent changes in his family life. He and his wife had recently been divorced and, because of her decision to leave the country to go with the Peace Corps, he required additional room to house three college-age sons during holidays and vacations from school. What he wanted was "two bedrooms, a study or three bedrooms, one of which I planned to use as a study, preferably with two baths."

Such an apartment seemed readily available. While driving through an area known as the "Moorlands," in Clayton, Missouri, plaintiff noticed a sign in front of 7537 Parkdale reading "For Rent 3–4 Bedrooms 2–Baths 863–6034."[7] Plaintiff called defendant on Friday, August 8th. Defendant admitted in her deposition[8] that she "could not recall" that she was able to form an opinion as to his race from the sound of his voice.[9] Plaintiff went to defendant's apartment on the following Sunday afternoon to see the apartment.[10] Up to this point it is uncontroverted that there had been nothing to indicate that he was black.

Upon plaintiff's attempt to visit the apartment, he was met by defendant's daughter. She told him that her mother had taken her father to the hospital but had not yet returned, and that she, the daughter, could not show the apartment. Plaintiff gave her his business card with his telephone number. When defendant returned, she was given the card and informed of the plaintiff's race.

Plaintiff telephoned the defendant later that evening to inquire about the apartment. The defendant replied that she "had somebody who was interested in the apartment" that she "would have to check the references though and if it were not rented I could call him, I had his 'phone number." She conceded on the stand that this was false. The apartment had not been rented at that time. No one had yet filled out an application, nor had anyone put down a deposit.[11]

The defendant explained her conduct on the ground that when she finds that a prospective tenant would not be suitable, one device employed by her, in order to avoid personalizing the objection, is to say, "[W]e'll have to check the references, or check, call back. I have other people interested in it." When asked "why [she] didn't want to show [her] apartment to Mr. Wharton" she replied "Because I had disastrous experiences in the past with divorced men in renting to them and it had cost me a great deal of money * * *." Specifically, they had "brought in women during the night" and had left the apartment dirty.

6. The district court's opinion is reported at 415 F.Supp. 633 (E.D.Mo.1976).

7. Defendant and her husband jointly own 7537 Parkdale and reside therein.

8. It was stipulated that all discovery and depositions, together with exhibits thereto, might be received in evidence, except for the deposition of Mrs. Woods, as to whom plaintiff had raised a question respecting her race, as determinable from her complexion. *See* text keyed to n. 25, *infra*.

9. The district judge expressed the opinion that "there isn't a way in the world that this Court at least could ascertain by his voice what his race was."

10. There is controversy over whether he came by appointment, as he claims, or simply walked in off the street, as defendant claims. The issue is peripheral.

11. Although there was some dispute over the type of apartment which Mr. Wharton originally sought, the defendant admitted that after Sunday, August 10, the plaintiff inquired only for a three bedroom unit, and that during this period, she had only one apartment available: 7533 Parkdale, Apartment 2E, a three bedroom unit.

Moreover, the activities of unsupervised teenagers had been disruptive to other tenants.

On the following morning plaintiff called Ms. Hedy Epstein, a white woman, Executive Director of the Greater St. Louis Committee for Freedom of Residence, told her what had transpired and that he thought he had suffered discrimination. Epstein stated that she would do some testing to determine whether or not discrimination had taken place. Accordingly, giving her name as "Mrs. Stone" she called defendant and asked if the apartment advertised on the sign [12] was still available. Informed that such an apartment was still available, Epstein went to see it, accompanied by a young white female law student, Susan Chapman, whom she introduced as "my daughter Susan." They were shown Apartment 2E at 7533 Parkdale. When asked by defendant about her family, Epstein replied that she was divorced and that she had three college-age children, who would be with her during vacations. At this time she was told that the apartment was available and that no one else had made a deposit on it.[13] Defendant admits that she gave Epstein an application form,[14] and told her that she could complete the form at home and mail it back to defendant with a check for $325.[15] As Epstein was leaving the apartment she asked if there were any "colored" living in the area. Defendant allegedly answered, in part, "[t]here are none in my buildings. I don't rent to them. They don't have that much money." Coming back to this issue at a later point Epstein said "So you don't rent to them?" Defendant replied "No, I haven't had to."

On the following day, August 12, 1975, Epstein identified herself on the telephone to defendant, told her of plaintiff's request for assistance, stated that it appeared that discrimination might have taken place, and told her that if there had been discrimination, it was a violation of both federal and state laws. When she asked defendant what she might tell the plaintiff, defendant replied, "put this in writing please," whereupon Epstein urged defendant not to rent the apartment to anyone else until the matter had been resolved. Epstein reduced this conversation to a letter to defendant on the same day. The letter appears in the record as plaintiff's Exhibit 2.

Epstein's letter was received by defendant on August 13, 1975. The following day defendant telephoned a Mrs. Leonard Warren, Jr., who had, in the previous month, expressed an interest in the apartment in question.[16] On August 15, Mrs. Warren submitted a completed application for the vacant apartment, accompanied by a postdated check for the security deposit. The Warrens executed a lease for the apartment on August 17, 1975.

■ Stripped of all controversial testimony and relying solely upon admissions and uncontroverted evidence, what this case boils down to in brief is that the plaintiff, a black man who can not be so identified as black by his voice alone, went to see an apartment. He was there observed to be black. His inquiry to the owner that evening concerning the availability of the apartment was met with the statement that it had been committed to another applicant. It is conceded that this assertion was false. The following day a white "checker" (Epstein) made an appointment to see the apartment. During the appointment she represented herself as being in circumstances reasonably similar to those of the plaintiff, that is, divorced, with three college-age

---

12. *See* text keyed to n.7, *supra.*

13. Despite her evasion of a previous question regarding what she told Epstein about other deposits, defendant admitted in her deposition that, as of August 11, 1975, no one had made any deposit on the apartment.

14. Included in plaintiff's Exhibit 1.

15. Defendant's brief asserts that she had no intention of leasing to Epstein because of her family situation, being divorced, and having a child.

16. The Warrens are a white couple who lived in University City, Missouri, and who were paying tuition to send their child to a predominantly white school in Clayton.

children. She was shown the apartment, given an application, and invited to submit her application with a deposit. When confronted with these events, the defendant quickly contacted a previously interested white couple (the Warrens) and completed the application, credit check, and formal rental procedures for their tenancy within five days.[17]

The trial court totally rejected Epstein's testimony on the ground that it was tailored to prove that the conduct of the defendant had been racially discriminatory. True, she was a "checker," attempting to ascertain whether or not there had been racial discrimination in the rejection of the plaintiff as a tenant. But the fact that she was a "checker" does not in and of itself stamp her as lacking in credibility. The use of checkers in this situation is well established and has been recognized as necessary under similar circumstances.[18]

Specifically, the trial court found that Epstein's written summary of her conversation with defendant "varies from [her] testimony and those portions of the conversation which are of benefit to the defendant are scratched out in [her] written summary so that [her] preconceived ideas as to the conduct of the defendant might be proved."[19] The scratching out to which the court refers is the deletion of the clause in Exhibit 1 (Epstein's handwritten chronology of events) respecting black applicants stating that "none have come here," whereas her trial testimony quotes defendant as saying that "No, I haven't had to" [rent to any blacks].[20] The change was made openly on the exhibit, without any attempt at subterfuge or rewriting of the page to conceal the change. It is at best a minor point, hardly justifying the significance given it by the district court in its analysis of Epstein's credibility.

The total omission from the findings of the corroboration of Epstein's testimony in all essential particulars by her companion, Susan Chapman, is not explained in the opinion. At oral argument it was sought to be justified on the ground that since Epstein was assertedly totally impeached, "Susan Chapman has to fall with her." This reasoning we reject for obvious reasons. In addition the trial court found that plaintiff's written summary of the entire incident (Exhibit 1) and her letter to defendant (Exhibit 2) were mutually impeaching, each of the other. The court has not specified wherein the impeachment lay, but we have reviewed these exhibits with care and we find nothing substantially impeaching, each of the other, therein.

The defendant contends simply that plaintiff was rejected under her objective standards just as a white man would have been upon the grounds that he was single, divorced with teenage children, and that he traveled, leaving them unsupervised. The difficulty with this defense is that it is not sustained on the record. She first asserted in her deposition, though not without equivocation, that she "always rent[ed] to families" and, as a rule, did not rent to single persons.[21] However, on the record, she had

---

17. The defendant admitted during her direct examination at trial that her motivation to obtain the Warrens as tenants arose out of her confrontation with Epstein on August 12:

Q Why did you rent to [the Warrens] at that time?

A Well, I felt that since I have all the work of spending a great deal of energy, blood, sweat and tears in the apartment I certainly should have a voice of who I want to have in the apartment, and Mrs. Epstein was very adamant when she called.

18. The use of checkers is a commonplace, their purpose being to compare the rental procedures employed as applied to black and white persons. Their evidence in discrimination cases has been uniformly accepted. See *United States v. Youritan Construction Co.,* 370 F.Supp. 643, 650 (N.D.Cal.1973), *aff'd as modified,* 509 F.2d 623 (9th Cir. 1975), and cases cited therein, as noted in *Smith v. Anchor Building Corp.,* 536 F.2d 231, 234, n.2 (8th Cir. 1976).

19. 415 F.Supp. at 635, Finding of Fact # 17.

20. In Defendant's version of this conversation she quotes herself as saying, "I never had [any black] who wanted an apartment."

21. From the deposition of defendant, with respect to 7533 Parkdale, Apartment 2E:

Q As to the kind of person or persons you would rent 2E to?

rented 7533 Parkdale, Apartment 3E to a single male on June 26, 1975, the record not indicating whether he was divorced or not. Also, it was clear from her cross-examination that she did not, as her brief asserts, have any consistent objective standards with respect to matrimonial or parental status.[22]

It is settled law that race is an impermissible factor in housing under both the Civil Rights Act of 1866 and the Civil Rights Act of 1968. It is equally clear that:

> The burden of proof in Title VIII cases is governed by the concept of the "prima facie case." *Williams v. Matthews Co.,* [499 F.2d 819, 826 (8th Cir. 1974), *cert. denied,* 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974)]. To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. *See id.* * * *
> The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated. * * * Effect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because
>
> > * * * [w]hatever our law was once, * * * we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.

*United States v. City of Black Jack, Missouri,* 508 F.2d 1179, 1184–1185 (8th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) (footnotes omitted; citations omitted).

A Yes. I always rent to families.
Q You always rent to families?
A I usually try to rent to families in that building because it's a large apartment.
Q And you have a policy of never renting to single persons?
A As a rule, I don't.

22. The defendant described her "objective standards" as follows:

In this case, as we noted, the district court found that no evidence was presented to establish a prima facie case of discrimination.

Our review of this finding is governed by the following considerations:

> "A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)." * * * The question is not simply whether the reviewing court would have found otherwise but whether the trial court could permissibly find as it did. The reviewing court should upset a finding only when it "is convinced on the whole record that the finding does not reflect the truth and right of the case." Wright, Federal Courts § 96, at 432.

*Movible Offshore, Inc. v. M/V Wilken A. Falgout,* 471 F.2d 268, 271 (5th Cir. 1973) (citation omitted).

So tested, the trial court's finding that the plaintiff has failed to carry his burden of proof with regard to a showing of discrimination is clearly erroneous. Our examination of the entire record leaves us with a firm conviction that a mistake has been committed. The chronology of events in the plaintiff's attempt to obtain an apartment from the defendant contains a strong implication that racial discrimination underlay the defendant's actions and statements. The defendant's claim that the plaintiff was rejected on objective, nonracial qualifications cannot be accepted on the record made.

■ Defendant had no uniformly applied policy with objective standards. As she

Q You do not have a generalized objection to leasing apartments to single individuals, do you; you are willing to lease to single persons, unmarried persons, correct?
A Sometimes I do.
Q Your sole objection is to leasing apartments to divorced individuals, is that correct?
A I rent to individuals according to how I feel—how people impress me with their application or what their references are.

admits,[23] she employed her private subjective standards, if such they may be called, renting to individuals "according to how I feel." Her feelings on this topic may best be judged by their results. Defendant owns and manages four apartment buildings, and co-owns a fifth with her husband, involving a total of 23 rental units, all purchased since 1969. She has never rented to a black tenant,[24] although evidence was presented that in 1974 she had offered an apartment to a black woman, a Mrs. Woods, to whom we have made prior references.[25]

Racial discrimination has been established both as a matter of fact and law.

We turn to damages. This court has recently examined the issue of damages in the context of a racial discrimination in housing case in *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231 (8th Cir. 1976).[26] Punitive damages, the claim for which was abandoned in *Smith, supra,*[27] may also be recoverable, as well as injunctive relief obtained, upon proper showings. We de-

cline to examine those issues further without first providing the district court an opportunity to decide them.[28]

Plaintiff also requests this Court to award attorney's fees. A hearing and decision on the plaintiff's recovery of attorney's fees were postponed in the district court pending a decision on the merits.[29] Rather than asking this Court to award attorney's fees under 42 U.S.C. § 3612(c),[30] plaintiff asks that we award a fee incident to our authority to enforce his rights under the Civil Rights Act of 1866, 42 U.S.C. § 1982.[31]

Recent legislation controls the award of attorney's fees to a plaintiff successful in an action founded on § 1982. The Civil Rights Attorney's Fees Awards Act of 1976, Pub.L.No.94–559 (Oct. 19, 1976), 90 Stat. 2641 [32] is the Congressional response to the Supreme Court's decision in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) that attorney's fees generally may

**23.** *See* n. 22, *supra.*

**24.** Although statistics are not controlling in an individual discrimination case, their relevance is clear, and they may be considered along with other factors as bearing upon racial discrimination, *Smith v. Anchor Bldg. Corp., supra,* at 235, n.7, *United States v. Youritan Constr. Co., supra.*

**25.** *See* n.8, *supra.*

**26.** We there held, in part that "[a]lthough any award of out-of-pocket losses may be limited in this case, * * * actual damages may be awarded for emotional distress and humiliation", *Smith v. Anchor Bldg. Corp., supra,* at 236.

**27.** *Id.,* n.8.

**28.** We note, merely, that the record contains evidence bearing upon a grant of compensatory and punitive damages, coupled with injunctive relief.

**29.** Although the plaintiff introduced evidence to show that he is financially unable to bear the cost of this suit, the parties postponed proof of the amount of trial court attorney's fees in an agreement reflected in the record:
"The Court: Let the record show that on the question of attorney's fees the Court is not receiving evidence at this time as to the amount thereof and that at such time as that

matter becomes an issue in the case the Court will inform counsel and, if necessary, have a hearing."
The district court's decision on the merits made reopening of this issue unnecessary.

**30.** A fee award under § 3612(c) would require us to decide whether or not plaintiff is "financially able" to assume his attorney's fees, a task more appropriate for the district court.

**31.** Several courts have awarded fees incident to enforcement of § 1982. *Knight v. Auciello,* 453 F.2d 852 (1st Cir. 1972); *Lee v. Southern Home Sites Corp.,* 444 F.2d 143 (5th Cir. 1971). *Accord, Morales v. Haines,* 486 F.2d 880 (7th Cir. 1973). These holdings were later criticized in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 270 n.46, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In light of our view of the recent revision of 42 U.S.C. § 1988, we express no opinion regarding the survival of the pre-*Alyeska* case authority regarding an award of attorney's fees under § 1982 alone.

**32.** Hereafter referred to as "1976 Act," Pub.L. No.94–559, as codified in 42 U.S.C. § 1988, provides in relevant part:
In any action or proceeding to enforce a provision of sections 1981 [to] 1983, 1985, and 1986 of this title, * * * the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

not be awarded absent an express statutory authorization.

■ Although the 1976 Act did not become effective until after the district court's decision, Congress clearly intended, and we have so held, that the 1976 Act should apply retroactively in cases pending on appeal on the 1976 Act's effective date. *Gay Lib v. University of Missouri*, 558 F.2d 848 at 857 (8th Cir. 1977), *Finney v. Hutto*, 548 F.2d 740, 742 (8th Cir. 1977).[33]

■ The 1976 Act tracks the statutory authorization for attorney's fees contained in Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b),[34] which was expansively construed by the Supreme Court in *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968): a plaintiff successful in asserting his rights under Title II "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman, supra*, at 402, 88 S.Ct.

at 966. The ample legislative history of the 1976 Act shows that Congress intended this liberal standard to control a fee award under the new statute. The Senate report on the bill ultimately enacted into law [35] specifies the *Newman* standard as the touchstone for an award under the 1976 Act:

It is intended that the standards for awarding fees be generally the same as under the fee provisions of the 1964 Civil Rights Act. A party seeking to enforce the rights protected by the statutes covered by [the Civil Rights Attorney's Fees Award Act of 1976], if successful, "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 [88 S.Ct. 964, 19 L.Ed.2d 1263] (1968).

S.Rep.No.94–1011, 94th Cong., 2d Sess. 4 (1976), *reprinted in* [1976] U.S.Code Cong. & Adm.News pp. 5908, 5912 (footnote omitted).[36]

---

**33.** Retroactive application was spelled out in the House report on a parallel bill, H.R.15460, 94th Cong., 2d Sess. (1976), and during the lengthy debate of the Act. The House report stated, "In accordance with applicable decisions of the Supreme Court, this bill is intended to apply to all cases pending on the date of enactment as well as all future cases. *Bradley v. Richmond School Board*, 416 U.S. 696 (1974):" H.R.Rep.No.94–1558, 94th Cong., 2d Sess. 4 n.6 (1976).

During the debate in the House of Representatives, Representative Anderson gave this reply to a question concerning retroactive application of the Act:

[I]t would apply to cases now pending, for the simple reason that if that were not the case, the award of fees would depend on the date that the case is filed. I do not think that is the basis on which a determination is made. To that extent, it is retroactive. Pending cases could receive an award of reasonable fees.

122 Cong.Rec.H12,155 (daily ed. Oct. 1, 1976) (remarks of Rep. Anderson).

Senator Kennedy also explained the retroactive effect during the Senate debate:

The Civil Rights Attorneys' Fees Awards Act authorizes Federal courts to award attorneys' fees to a prevailing party in suits presently pending in the Federal courts. The application of this Act to pending cases is in conformity with the unanimous decision of the Supreme Court in *Bradley v. School*

*Board of City of Richmond*, 416 U.S. 696 [94 S.Ct. 2006, 40 L.Ed.2d 476] (1974).

This application is necessary to fill the gap created by the *Alyeska* decision and thus avoid the inequitable situation of an award of attorneys' fees turning on the date the litigation was commenced.

122 Cong.Rec.S17,052 (daily ed. Sept. 29, 1976) (remarks of Senator Kennedy).

**34.** 42 U.S.C. § 2000a–3(b) provides as follows:

"In any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person."

**35.** S.2278, 94th Cong., 2d Sess. (1976).

**36.** The House report reached the same conclusion regarding the standard by which an award would be made.

The second key feature of the bill is its mandate that fees are only to be allowed in the discretion of the court. Congress has passed many statutes *requiring* that fees be awarded to a prevailing party. Again the Committee [on the Judiciary] adopted a more moderate approach here by leaving the matter to the discretion of the judge, guided of course by the case law interpreting similar attorney's fee provisions.

\* \* \* \* \* \*

The Committee intends that, at a minimum, existing judicial standards, to which ample

Our previous examination of the record indicated that the defendant violated both 42 U.S.C. §§ 1982 and 3604. Employing the *Newman* standard as our guide, we have reexamined the record and fail to find any special circumstances which would render an award of attorney's fees unjust. Accordingly, we award to plaintiff $1500 as a reasonable attorney's fee for his appeal. On remand, upon allowing plaintiff an opportunity to offer relevant proof, the district court shall determine and enter an award of reasonable attorney's fees for the district court phase of this case.[37]

Reversed and remanded for proceedings consistent with this opinion.

reference is made in this report, should guide the courts in construing [this bill].
H.R.Rep.No.94–1558, 94th Cong., 2d Sess. 8 (1976) (footnote omitted; emphasis in original).

The same report quoted from *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968) as the existing judicial standard for an award of fees to a prevailing plaintiff: "[A] prevailing plaintiff 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" H.R.Rep.No.94–1558, *supra*, at 6.

Representative Seiberling, the original congressional sponsor of legislation to authorize the awarding of attorneys' fees in civil rights cases, expressed a similar understanding:

[T]he civil rights attorneys' fee legislation which I introduced—H.R.8220, with 16 co-sponsors—called for the mandatory award of attorneys' fees to prevailing plaintiffs, because I felt that the awards should be automatic except in the most extraordinary circumstances. I understand that [this bill] will codify that view as to prevailing plaintiffs, following the Piggie Park guidelines.
122 Cong.Rec.H12,165 (daily ed. Oct. 1, 1976) (remarks of Rep. Seiberling).

*See also*, Note, *The Civil Rights Attorneys' Fees Awards Act of 1976*, 34 Wash. & Lee L.Rev. 206, 216–217 (1977).

**37.** Factors bearing on the amount of an award have been ably articulated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir. 1974), which was commented on favorably in the legislative reports underlying the 1976 Act. *See* H.R.Rep.No.94–1558, *supra*, at 8; S.Rep.94–1011, *supra*, at 6.