**Brenda SMITH, Appellant,**

v.

**ANCHOR BUILDING CORPORATION, a corporation, Appellee.**

No. 75–1554.

United States Court of Appeals, Eighth Circuit.

Submitted March 8, 1976.

Decided May 13, 1976.

As Amended July 15, 1976.

Rehearing and Rehearing En Banc Denied July 27, 1976.

232

Francis H. Kennedy, Jr., St. Louis, Mo., for appellant.

John P. Emde, St. Louis, Mo., for appellee; Fred Leicht, Jr., St. Louis, Mo., on brief.

Before LAY, ROSS and STEPHENSON, Circuit Judges.

ROSS, Circuit Judge.

Brenda Smith brought this action individually under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, and the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 *et seq.*, charging Anchor Building Corporation (Anchor) with racial discrimination in refusing to rent an apartment in St. Louis, Missouri. She requested actual and punitive damages but sought no affirmative relief. The district court, sitting without a jury, denied relief finding that plaintiff Smith was not refused an apartment on the

basis of race.[1] The sole issue on this appeal is whether the district court's finding is clearly erroneous. We reverse and remand for further proceedings.

## I.

Race is an impermissible factor in housing under both the Civil Rights Act of 1866 and the Civil Rights Act of 1968. Congress enacted this legislation under the thirteenth amendment to eliminate the badges and incidents of slavery. *Williams v. Matthews Co.*, 499 F.2d 819, 825 (8th Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). As the Supreme Court stated in *Jones v. Mayer Co.*, 392 U.S. 409, 442–443, 88 S.Ct. 2186, 2205, 2209 (1968):

> [W]hen racial discrimination herds men into ghettos and makes their ability to buy property turn on the color of their skin, then it too is a relic of slavery.

It is, therefore, the obligation of the courts to look beyond the form of a housing transaction and proscribe practices which actually result in racial discrimination. *Williams v. Matthews Co., supra*, 499 F.2d at 826. Effect, not motivation, is the touchstone because a thoughtless housing practice can be as unfair to minority rights as a willful scheme. *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975).

The concept of the prima facie case applies to an individual housing discrimination case. *United States v. City of Black Jack, id.*, 508 F.2d at 1184; *Williams v. Matthews Co., supra*, 499 F.2d at 826; *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973). Therefore, where a black rental applicant meets the objective requirements of a landlord, and the rental would likely have been consummated were he or she a white applicant, a prima facie inference of discrimination arises as a matter of law. If the inference is not satisfactorily explained away, discrimination is established. *Williams v. Matthews Co., supra*, 499 F.2d at 826.

In this case the district court found that no evidence was presented to establish racial discrimination. It is well established that under Fed.R.Civ.P. 52(a), this finding must not be disturbed unless " * * * the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948); *see also Stevens v. Dobs, Inc.*, 483 F.2d 82, 83 (4th Cir. 1973). After reviewing this record, we are firmly convinced that a mistake has been committed.

Plaintiff Brenda Smith is a black woman. In January 1973, she first contacted Park Ridge Apartments, owned by defendant Anchor, about the prospect of renting an apartment on approximately June 1, 1973. Plaintiff was told at this time that she should wait to apply until some five or six weeks before the desired occupancy date. In February 1973, Smith picked up a rental application at Park Ridge. She was told by management to fill out the application and bring it back personally. This procedure was followed because management preferred to "see" applicants before approving an application. Smith filled out the application at home and returned to Park Ridge on March 4, 1973. At that time she expressed a preference for a second floor one-bedroom apartment and again stated her desire to move in around June 1, 1973. Plaintiff was told that she would be required to deposit fifty dollars when notified that a suitable apartment was available. Her application was approved on March 18, 1973.

Between the middle of March 1973, and June 25, 1973, plaintiff contacted Park Ridge at least fifteen times regarding the availability of a one-bedroom apartment. She visited the complex approximately five times. She telephoned the complex at least ten times. Each time she was told that no one-bedroom apartments were available.

On June 22, 1973, Ms. Smith contacted Virginia Polen, a real estate coordinator

---

1. The district court's opinion is reported at 397 F.Supp. 256 (E.D.Mo.1975).

employed by Monsanto Company, the plaintiff's employer. Plaintiff told Ms. Polen of her difficulties at Park Ridge. Ms. Polen called the complex to inquire about the availability of one-bedroom apartments and was informed that an apartment was available. She immediately informed Ms. Smith of the vacancy and urged her to contact Park Ridge. Ms. Smith went to Park Ridge later in the day and inquired about the vacancy. She was informed that no one-bedroom apartments were available and that the vacancy of which Ms. Polen had been informed was filled by a person who had walked in that day and applied.

In the morning on June 25, 1973, Ms. Smith filed a complaint with a local civil rights organization, Freedom of Residence (FOR), which investigates suspect housing practices. Plaintiff talked with Hedy Epstein, the director of the organization, who informed her that she (Ms. Epstein) would send a white "checker"[2] to Park Ridge. Ms. Epstein directed a white employee, Terry Irion, to check the availability of one-bedroom apartments at Park Ridge.

At approximately ten a. m. on June 25, plaintiff called Park Ridge and was told that no one-bedroom apartments were available. Checker Irion arrived at the complex sometime before noon on June 25 and applied for immediate occupancy of a one-bedroom apartment. Irion was told that a one-bedroom apartment was available and that, assuming his credit references were adequate, he could move in the next day. He was also told that a fifty dollar deposit was necessary to process the application. Irion was notified the next day that his application had been accepted.

The evidence also showed that Ronald Johnson and Melva Lynn Thomas, a black couple, received treatment similar to that accorded Ms. Smith from Park Ridge at a time contemporaneous with plaintiff's rejection.[3] On June 17, 1973, Johnson and Thomas contacted the complex by telephone to inquire about the prospect of renting a one-bedroom apartment. At two p. m., they arrived at Park Ridge and were told that another person had rented the last available apartment at one-thirty p. m. They inquired again on June 19 and were told that an apartment might be available in a month.

Because they suspected discrimination, Johnson and Thomas complained to FOR on June 21, 1973. Hedy Epstein personally investigated the complaint on the same day. She telephoned Park Ridge and inquired about the prospect of immediately renting a one-bedroom apartment. She was told that immediate occupancy could be "arranged".

Ms. Epstein again sent a white checker, Judy Natale, to check the availability of one-bedroom apartments at Park Ridge. Ms. Natale visited the complex on June 21 and requested a one-bedroom apartment for herself and her fiance. She was told that her fiance could move into a one-bedroom apartment the next day.

The evidence of the Johnson-Thomas complaint is highly probative. The investigation of the complaint occurred one day before Ms. Smith complained to Ms. Polen, Monsanto's real estate coordinator, and four days before Ms. Smith lodged her complaint with FOR.

■ The irresistable inference from plaintiff's uncontroverted evidence is that she was denied an apartment on the basis of race. Ms. Smith applied and was qualified for a one-bedroom apartment at Park Ridge. Despite her qualifications, she was repeatedly rejected until June 28, 1973.[4]

---

2. The function of a checker in this context was to compare rental procedures as applied to black and white persons. Evidence of the experience of checkers has been uniformly admitted into evidence to show the existence of discrimination. See *United States v. Youritan Construction Co.*, 370 F.Supp. 643, 650 (N.D. Cal.1973), and cases cited therein.

3. Ms. Smith offered evidence of two other incidents, one in October 1973, and another in January 1971, to establish a pattern of racial discrimination.

4. Ms. Smith was offered an apartment on June 28, 1973. She declined the offer because of her treatment at Park Ridge. She found a suitable apartment shortly thereafter. The record is not

After several rejections, management continued to offer one-bedroom apartments to other applicants. We hold that plaintiff met her prima facie burden of showing racial discrimination under the standards of *McDonnell Douglas Corp. v. Green, supra*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677.

It stretches credulity to believe, as the defendant argues and the district court found, that no suitable apartment was available for plaintiff before June 28.[5] A one-bedroom apartment was rented to a person not named in the record on June 17, 1973, immediately before Ms. Thomas and Mr. Johnson, the black couple, visited Park Ridge. A one-bedroom apartment was also offered to Ms. Epstein on June 21, 1973, after the black couple complained to FOR. Another one-bedroom apartment was offered to white checker Natale on June 21. A one-bedroom apartment was offered to another unknown person on June 22 between the time Ms. Polen phoned Park Ridge and when Ms. Smith visited the complex later that day. Yet another offer was made to white checker Irion on June 25, shortly after Ms. Smith was told that no one-bedroom apartments were available.[6] It is significant that these applicants were each offered a one-bedroom apartment after their first contact with Park Ridge. Ms. Smith was rejected at least fifteen times before she was offered a one-bedroom apartment on June 28. The district court's finding that a suitable apartment was not available for Ms. Smith before June 28 is clearly erroneous.[7]

Anchor does not seriously argue that the treatment accorded Ms. Smith was justified by business necessity. Oblique reference is made to the high occupancy rate at Park Ridge. Stripped to its essentials, this argument seems to be that defendant's need to immediately fill apartments justified its disorganized and arbitrary selection procedures which in turn justified the patent discrimination on this record. We reject this contention because an arbitrary and unnecessary housing practice must be removed where it operates to discriminate on

clear as to whether the June 28 offer was made by management with or without knowledge of any impending legal action. Although the offer does not defeat plaintiff's prima facie showing of discrimination before June 28, it is relevant as to her damages and subject to further proof on remand.

5. According to the defendant, only three one-bedroom vacancies occurred in June 1973. See *Smith v. Anchor Building Corp.*, 397 F.Supp. 256, 258 (E.D.Mo.1975). The first purportedly occurred on June 4 when the tenant vacated an apartment which was in extremely poor condition. A hold was placed on this apartment by law enforcement officials apparently until June 25, when the apartment was offered to checker Terry Irion. The second vacancy allegedly occurred on approximately June 21 when a tenant committed suicide. This vacancy could not be filled until after July 1 because the personal effects of the tenant remained in the apartment. The third apartment became available on June 19 when the tenant vacated the premises. This apartment was offered to Ms. Smith on June 28.

6. This is the only instance, where an apartment was offered to another person instead of Ms. Smith, which was adequately explained at trial by the defendant. See note 5 *supra*.

7. Defendant argues that the racial make-up of Park Ridge is strong evidence that Ms. Smith was not refused an apartment on the basis of race. On direct examination, Mr. Morton, the apartment manager, stated that in June 1973, approximately twenty-five percent of the tenants at Park Ridge were black. On cross-examination however, Morton stated that he had no way of knowing how many black tenants resided at Park Ridge in June 1973. Ms. Downing, the property manager, testified that she knew approximately thirty-five to forty black families (ten to twelve percent) at Park Ridge. No statistics were offered by the defendant as to either the racial make-up of Park Ridge or the surrounding community in June 1973. The testimony of Morton and Downing was speculative and of little probative value. Moreover, this is an individual discrimination case. Although statistics are relevant in an individual discrimination case, *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1201–1202 (7th Cir. 1974), they are not controlling. *Id.*; *Williams v. Matthews Co., supra*, 499 F.2d at 827; *cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 805 n. 19, 93 S.Ct. 1817, 1826, 36 L.Ed.2d 668, 679 (1973). We therefore reject the defendant's contention that the evidence as to the black population at Park Ridge requires affirming the district court's finding of no discrimination.

the basis of racial or other impermissible classification. *United States v. City of Black Jack, supra,* 508 F.2d at 1184; *cf. Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158, 164 (1971).

Plaintiff has established an unrebutted case of racial discrimination in housing. Accordingly, we remand this case to allow the district court to fashion appropriate relief.

## II.

The district court found as a matter of fact that Ms. Smith failed to show any damages relating to her inability to obtain housing at Park Ridge. We disagree.

█ Although any award of out-of-pocket losses may be limited in this case, see note 4 *supra,* actual damages may be awarded for emotional distress and humiliation. *Williams v. Matthews Co., supra,* 499 F.2d at 829; *Seaton v. Sky Realty Co.,* 491 F.2d 634, 636 (7th Cir. 1974). At trial, Ms. Smith made the following statement:

> * * * I just felt I was really embarrassed that it [discrimination] was really happening and I see it's really a true thing and I was really hurt and humiliated me (sic) because I'm black; that stopped me from moving where I want to move.

Trial Transcript at 28. On remand, the district court is directed to consider any emotional distress suffered by Ms. Smith in computing actual damages.[8]

█ Reasonable attorney fees are also awardable to a prevailing plaintiff in a housing discrimination suit under 42 U.S.C. § 3612(c). The Supreme Court has indicated a policy favoring the award of attorney fees in civil rights cases. *Cf. Newman v. Piggie Park Enterprises,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263, 1265 (1968). However, § 3612(c) allows attorney fees only if the plaintiff is not financially able to assume such fees. The record contains no evidence as to plaintiff's ability to pay attorney fees. We therefore direct the district court to take evidence on this issue and, if plaintiff is not financially able to assume said fees, award reasonable and adequate attorney fees for both trial and appeal.[9]

Section 3612(c) also allows an award of court costs to a prevailing plaintiff. The district court is directed to assess court costs of trial against the defendant. *See Williams v. Matthews Co., supra,* 499 F.2d at 829. The costs of this appeal are assessed against the defendant.

The judgment is reversed and remanded for further proceedings consistent with this opinion.

█

---

8. We find punitive damages inappropriate in this case. At oral argument, plaintiff's counsel abandoned any claim for punitive damages.

9. We do not regard the proviso contained in § 3612(c) as limiting attorney fees to only those persons of indigent status. *Hairston v. R. R. Apartments,* 510 F.2d 1090, 1091–1092 (7th Cir. 1975); *Marr v. Rife,* 503 F.2d 735, 744 (6th Cir. 1974); *Sanborn v. Wagner,* 354 F.Supp. 291, 297 (D.Md.1973). This test would summarily preclude a person with nonliquid assets, such as a home, from asserting his or her civil rights.

We construe the words "not financially able to assume said attorney's fees" in § 3612(c) to mean that plaintiff is unable to assume such fees considering her current assets and immediate economic prospects realistically viewed. Speculative consideration of future earnings, anticipated profits and the like are to be avoided. We do not regard *Steele v. Title Realty Co.,* 478 F.2d 380, 385 (10th Cir. 1973), as holding to the contrary.