447 F.Supp. 624 (1978)
Carol J. NORMAL and McKinley Normal, Plaintiffs,
v.
ST. LOUIS CONCRETE PIPE CO., Russell A. Grantham d/b/a Grantham Management Co., Edwin Ryder, Jr., Lawrence F. Behymer, Sr., William Riley, Ray LaBrayere, Harold E. Grau and John Berra, Defendants.
No. 75-833C(B).
United States District Court, E. D. Missouri, E. D.
February 15, 1978.
*625 Francis H. Kennedy, Jr., St. Louis, Mo., for plaintiffs.
John R. Musgrave, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
REGAN, District Judge.
In this civil rights action, plaintiffs, a black married couple, seek injunctive relief and damages incurred as a result of alleged discriminatory acts in the rental of housing. Subject matter jurisdiction exists as alleged. 42 U.S.C., section 3612. Plaintiffs base their claim upon 42 U.S.C., section 3601 et seq. (The Fair Housing Act of 1968) and section 1983. Specifically, plaintiffs allege that their civil rights were violated by *626 defendants' refusal to lease premises to them on the basis of race and sex. In our judgment, the weight of the evidence does not support plaintiffs' contentions.
At all relevant times, defendants have been engaged in the business of selling single family dwellings which they have constructed in their Pleasant Hollow subdivision located in an unincorporated area of St. Louis County northwest of the City of Hazelwood. The 554 homes in the subdivision are in the moderate price ($24,000 to $34,000) range. The project is under the management of defendant Russell Grantham, doing business as Grantham Management Company. The home office of the management company is located some three miles distant from the subdivision. However, it maintains a local office in a display house where applications for unsold homes are taken by leasing agents who are employed under the general supervision of Marvin (Marty) Grantham, Russell Grantham's nephew.
To facilitate sales, defendants offered to applicants a lease-purchase plan pursuant to which a home would be leased for a period of three years with an option to purchase at a stipulated price at the end of the lease term. Upon exercise of the option, up to twenty per cent of the rental payments would be credited to the down payment. As of the time of the trial (about five years after the subdivision had been opened) some 155 of the homes had been sold and 356 of the remaining 389 dwellings were being rented on the lease-purchase arrangement. The ultimate purpose of defendants was to sell, rather than rent, the single family homes, having found through experience that the project would not otherwise be profitable. Unlike the usual lease of an apartment, the leases of the homes in the subdivision required the tenants to keep the properties in good repair.
Prior to September, 1974, the screening of applicants was very slipshod, and defendants encountered a number of problems adversely affecting the profitability of the project. For example, some of the tenants would fail to meet their obligations respecting the payment of rent and the repair of the rented premises. Unsupervised children of some residents would damage or vandalize homes in the subdivision. As the result, defendants developed what they term an underwriting process, that is, a careful evaluation of the risks, if any, involved in approving each application for a home in the subdivision.
The lease application itself is made at the office in the display home on a form prepared by Grantham Management Company. Each application is initially screened by the leasing agent on duty in the display home, and if on its face the application meets certain specified minimum criteria (or if it is a "borderline case") the application is "accepted" for submission to the home office. If the application is "accepted" by the leasing agent, the applicant is required to fill out and sign a job verification form to enable the home office to verify statements as to employment and income.
The criteria or "guidelines" utilized by the leasing agent in determining whether the application should be submitted to the home office had been prepared and posted in the office by Marty Grantham in September, 1974, based on his recollection of discussions he had with Russell Grantham. They excluded from initial "acceptance" applications from single persons, persons under the age of 21 years (except with a co-signer), families with more than 4 children and 2 adults or a total of 6 persons per house, and families with a combined weekly salary less than a sum equal to one month's rent.
If an application was "accepted" under the "guidelines," (or if it was a "borderline case" or one in which teen-age children would be at home while both parents were working), the guidelines stated that it would then be submitted to the home office for further consideration based on "financial stability, credit rating, personal reputation, length of employment and/or probability of continued employment, etc. of the applicant." In instances where a particular applicant did not meet the standard of the guidelines, but nevertheless insisted on *627 home office consideration, the application would be forwarded.
The posted guidelines specifically state that ten days to two weeks should be allowed for final approval of all submitted applications. During that period credit data and employment verifications would be checked and ultimately evaluated by Russell Grantham. He alone had authority to approve an application. The extent of the home office study depended in large part upon the nature of the information submitted by the applicant. On occasions when he was otherwise satisfied with the acceptability of an applicant, Russell Grantham would forego the usual in-depth study of the application.
With these background findings, we turn to the merits of plaintiffs' charges of sex and race discrimination.
Plaintiffs, accompanied by their teenage son, visited the display home in Pleasant Hollow subdivision, on Wednesday, August 27, 1975, about a year after the "guidelines" had been posted. They spoke to Diane Irwin, the only employee of Grantham Management Company who was on duty that day. As it happened, Wednesday was Marty's regular day off. The Normals looked at several homes and were favorably impressed with one the monthly rental of which was $235. An application to rent that dwelling on a lease-purchase arrangement was then filled out and signed. So, too, were job verification forms by each of the Normals.
We do not credit plaintiffs' evidence that Mrs. Irwin stated that Mrs. Normal's salary would not be counted for purposes of qualifying them as tenants. Such a comment would not only be beyond the scope of her limited authority and inconsistent with the posted guidelines which Mrs. Irwin had been applying for about a year, but would make meaningless her requirement that both Mr. and Mrs. Normal execute and sign job verification forms (and the fact that both such forms were actually sent by defendants to their respective employers). We find as a fact that the Normals were told by Mrs. Irwin that the wife's income as well as that of her husband would be considered by the home office in determining whether their combined income was sufficient, that a credit check would be made, and that processing the application for final decision by the home office would take ten days to two weeks. We further find, as appears infra, that neither the Grantham Management Company nor any other defendant had or applied a policy of excluding the wife's income in considering whether an application should be approved.
After the application was "accepted" by Mrs. Irwin, she placed it in Marty Grantham's desk. The following morning, Thursday, August 28, 1975, Marty checked it over, found it was properly "accepted," and began the processing procedure by mailing the job verification forms to the respective employers. Friday morning, August 29, he delivered the application to Russell Grantham's secretary at the home office.
There appeared to be no urgency requiring immediate processing, since occupancy was not desired by the Normals until October 1, 1976. Nevertheless, although she had been told that processing would take ten days to two weeks, Mrs. Normal telephoned the display office on Tuesday, September 2, (the day after the Labor Day holiday). Mrs. Irwin, who worked only from Wednesday through Saturday, was not on duty that day so Mrs. Normal spoke to Marty Grantham and inquired of him as to whether the application had been approved. He told her that as of then, the application had not, to his knowledge, been either approved or rejected and that her call was much too early in view of the ten days to two weeks required for processing, and he suggested that she check back after allowing sufficient time for the processing. Later that day, Mr. Normal called and spoke to Marty Grantham. He too was told by Marty of the ten day to two weeks period which would be required to obtain the necessary information. During one of these Tuesday telephone conversations Marty mentioned that the time required for an adequate credit check was the primary reason for the length of the processing period.
*628 Two days later, in the morning of Thursday, September 4, 1976, Mrs. Normal called the display house three different times. On the first call, she asked to (and did) speak to Mrs. Irwin, making the same inquiry as to whether the application had been approved. After ascertaining from Marty that he had heard nothing about the application, Mrs. Irwin so informed Mrs. Normal. Later that morning, Mrs. Normal again telephoned, not once but twice, each time talking to Marty and being told of the normal period of time required to process an application. We find that in these telephone conversations with Marty, Mrs. Normal spoke in a rude and angry manner which was wholly unwarranted by Marty's statements or tone of voice.
Still another call to Marty was made that day, this one by Mr. Normal. He, too, was told that Marty had heard no word about the application. In the meantime, during the course of that day, Mrs. Normal had checked various sources, including the Missouri Real Estate Board, in an effort, which proved successful, to ascertain the telephone number of the management company. Later that same afternoon, Mrs. Normal called the number and asked to speak to Russell Grantham. He was not in, and Mrs. Normal did not leave her number for a return call.
The following morning, Friday, September 5, Mrs. Normal again called the home office and, being told that Russell Grantham was not in, spoke to Mrs. Angie Gill, his secretary. She identified herself as an applicant for a home in Pleasant Hollow and was told by Mrs. Gill that the principal considerations in the evaluation of an application were the income and credit rating of the applicant, each of which would be checked. Mrs. Gill had not seen the Normals' application prior to the telephone conversation and expressed surprise when Mrs. Normal stated that she had been told that the wife's income would not be counted. Mrs. Normal insisted that she be given an immediate answer on her application and was told by Mrs. Gill that she couldn't give her an answer since she knew nothing about it, but would check into the matter and try to find out the status of the application. Mrs. Normal was not satisfied with this answer and continued to repeat the same questions and persisted in demanding definitive answers in a manner characterized as rude by Mrs. Gill.
Mrs. Gill prepared a memorandum of the highlights of her conversation with Mrs. Normal and gave it to Russell Grantham. She also discussed the conversation with him. Later that morning, when Marty was routinely in the home office, Russell Grantham asked him about the Normal application in light of Mrs. Gill's memorandum. Marty then told Russell Grantham that the Normals had been "driving (him) crazy" and harassing him with their telephone calls demanding an answer to their application. After looking at the application which he had not theretofore examined, Russell Grantham told Marty that there was no reason to waive the normal underwriting procedure and that if the Normals wanted an answer "today or now," prior to the receipt of employment verifications and credit checks, the only available answer is "no." There was no discussion relating to the merits of the application.
Later that day (September 5), Mr. Normal called Marty at the display home and again asked for an answer to the application. Weary of the repetitive and harassing calls from the Normals, Marty told Mr. Normal that the application was "rejected," but did not state the reason. He specifically denied, when asked by Mr. Normal, that the rejection was due to the number of their children (4) or a refusal to count his wife's income. About 20 minutes later, Mrs. Hedy Epstein, the executive director of Freedom of Residence, telephoned Marty and asked him why the Normal application had been rejected. Marty declined to discuss the matter with her.
In the intervening period between these calls, Mrs. Normal had been informed by her husband of the "rejection," and she telephoned the home office, following which she contacted Mrs. Epstein as well as a lawyer (present counsel for plaintiffs) who *629 was recommended by Mrs. Epstein. In her call to the home office, Mrs. Normal left a message for Russell Grantham to the effect that the Normals "were going to file suit against them for discrimination."
As we have noted, plaintiffs allege both sex and racial discrimination. First, as to the claim of sex discrimination. This is based on the contention that in making their determination to reject the Normals' application, one basis was defendants' alleged refusal to take into account a wife's income in ascertaining whether the family income in sufficient to meet defendants' minimum income requirements for applicants.
Plaintiffs' theory is that defendants' alleged refusal constitutes sex discrimination violative of Section 804(b) of Title VIII (42 U.S.C. Section 3604(b) ) in that had the income of the husband alone been sufficient, the application would have been acceptable. The difficulty with this contention is that it is not supported by the weight of the credible evidence. It is also inconsistent with the fact that defendants sought to verify the employment and salary of both spouses. We find that defendants were not guilty of sex discrimination in any respect. To the contrary, it was the consistent policy of defendants to take into consideration the combined income of both spouses. We specifically find that this policy was applied with respect to the Normals, that income was not a factor to any extent in the rejection of their application, and that neither Russell Grantham nor any other agent or employee of defendants stated that Mrs. Normal's income was or had been excluded.
We next consider plaintiffs' claim of racial discrimination. It is beyond question that "[r]ace is an impermissible factor in housing under both the Civil Rights Act of 1866 and the Civil Rights Act of 1968," and that the effect, rather than the motivation, of a housing practice is the touchstone in examining the conduct of the defendants. Smith v. Anchor Building Corporation, 8 Cir. 1976, 536 F.2d 231, 233. Thus, the issue here is whether plaintiffs make a prima facie case of racial discrimination and, if so, whether defendants' evidence rebutted the prima facie showing.
Smith states the applicable rule as follows: "[W]here a black rental applicant meets the objective requirements of a landlord, and the rental would likely have been consummated were he or she a white applicant, a prima facie inference of discrimination arises as a matter of law. If the inference is not satisfactorily explained away, discrimination is established." 536 F.2d l. c. 233.
As of the time the Normals' application was rejected, neither Russell nor Marty Grantham had any knowledge of their race. The only employee of defendants who had actually seen the Normals prior to this litigation was Mrs. Irwin, and it is evident to us that it simply did not and would not occur to her to mention their race to Marty. She was a regular baby sitter for black families in the subdivision. The fact is that Mrs. Irwin was favorably impressed with the Normals (and they with her), and she had no hesitancy in "accepting" their application. There is not the slightest inference (or claim) of racial prejudice on her part.
Plaintiffs argue that the accent of the Normals was that of black persons, so that one or the other of the Granthams could have at least suspected their race by having heard them on the telephone. We do not agree. Both plaintiffs testified in person. In our judgment, Mrs. Normal, who did most of the telephoning, spoke without any Negroid accent, and we do not believe that we would have discerned a peculiarly Negroid accent on the part of Mr. Normal had we heard him talk in his three separate and brief telephone conversations.
Plaintiffs further argue that in light of the fact that their application revealed that the Normals were then tenants of the St. Louis Housing Authority in an area where blacks reside, the inference could be drawn that defendants were apprised thereby of the Normals' race and that they rejected the application for that reason. We find no basis in the credible evidence for drawing this inference, particularly when account is *630 taken of the fact that Pleasant Hollow is and has been since its inception an integrated subdivision without any governmental or other pressures.
The credible evidence does not warrant a finding that the race of plaintiffs was a factor in the rejection of their application, or that they received more onerous treatment in the underwriting and evaluation process than white persons would have received in comparable situations. To the contrary, it is evident to us that the Normals were rejected by reason of their persistent, demanding, harassing, and increasingly rude telephone calls, the purpose of which could well have been to force their acceptance prior to completion of the underwriting process. It is clear from the evidence that management viewed the underwriting function as too important to be blindly waived at the insistence of any applicant, whether white or black.
We are aware of evidence to the effect that some applicants had on occasions called the display office to inquire as to the status of their applications. However, there is no substantial evidence that such applicants (presumably white) did so prior to the 10 day minimum period specified for processing or that such calls were of the persistent, demanding and sometimes rude nature of plaintiffs' calls.
As of the morning of September 5, 1977, when Russell Grantham authorized the rejection of the Normals' application, he had become aware only of the statements on their application and the nature and persistence of their telephoning. He had not yet received either the employment verification forms or the Normals' credit history. As to the latter, it was obvious from the application (showing a bank account only in Mrs. Normal's name, that their then rent was less than half of that in Pleasant Hollow, and that they had no open credit accounts) that further credit investigation was warranted and should not lightly be abandoned.
We believe it significant that the Normals themselves were concerned about their credit history, and rightly so in light of the fact that not only had Mr. Normal been discharged in bankruptcy on two occasions (1963 and 1969) and that Mrs. Normal had also gone through bankruptcy in 1970, but they had been sued on numerous occasions by various creditors, including their then landlord. It is reasonable to infer that the Normals' demands for immediate approval were made in a calculated effort to prevent defendants from becoming timely aware of their credit record.
Although we can only speculate as to whether the Normals would have been accepted in spite of their bad credit record if it had been made known to defendants, it is, to say the least, not at all clear that "the rental would likely have been consummated were (the Normals) a white applicant" with a comparable credit history. Cf. Smith v. Anchor Building Corporation, supra, and Williams v. Mathews Company, 8 Cir. 1974, 499 F.2d 819, in each of which cases a known black made a prima facie case by evidence showing that in all likelihood the transaction would have been consummated had he been white.
We believe it of importance to note that at no time in her telephone conversations with either Marty or Russell Grantham did Mrs. Hedy Epstein mention the race of the Normals nor indicate that race was involved in their rejection. She was concerned only with ascertaining whether Mrs. Normal's income was for consideration. So, too, Mrs. Elizabeth Kennedy, one of the attorneys employed by the Normals on September 5, made no mention of race in her September 9 telephone conversation with Russell Grantham. Even the Normals, vocal as they were, did not refer to their race prior to the instant litigation.
It is our view that plaintiffs' (then unknown) race played no part whatever in the rejection of their application. It follows that plaintiffs are not entitled to recover. The foregoing Memorandum Opinion constitutes our findings of fact and conclusions of law. Judgment will be entered in favor of defendants.