**HEIGHTS COMMUNITY CONGRESS, et al., Plaintiffs,**

v.

**HILLTOP REALTY, INC., et al., Defendants.**

No. C79–422.

United States District Court, N.D. Ohio, E.D.

March 21, 1985.

Avery S. Friedman, Cleveland, Ohio, Kathryn Gonser Eloff, Beachwood, Ohio, Donald K. Barclay, Cleveland Hts., Ohio, for plaintiffs.

Anthony J. DiVenere, Richard A. Dean, Arter & Hadden, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, Senior District Judge.

Plaintiffs Heights Community Congress (HCC) and the City of Cleveland Heights (City) seek attorney's fees and costs pursuant to 42 U.S.C. § 3612(c), which provides:

> The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided, That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.*

(Emphasis added.) In a memorandum and order of January 2, 1985, this court found that the City and HCC are "prevailing plaintiff[s]." Before these prevailing plaintiffs may recover under section 3612(c), however, the court must determine whether each plaintiff is "financially able to assume said attorney's fees." After receiving evidence on this issue at a hearing on December 24, 1984, as well as supplemental briefs, the court now considers whether the City and HCC meet the financial inability condition set forth in the proviso of section 3612(c).

### I.

### A.

The underlying purpose of allowing a prevailing plaintiff to recover attorney's fees under section 3612(c) is to encourage someone injured by racial discrimination to seek judicial relief by acting as a "private attorney general." *Hairston v. R & R Apartments*, 510 F.2d 1090, 1092 (7th Cir. 1975). In *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), the Supreme Court discussed the 'private attorney general" purpose behind the attorney's fees provision of Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a–3(b). The Court

explained that "[i]f successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts." *Id.* at 402, 88 S.Ct. at 966. Citing this language, the Sixth Circuit in *Marr v. Rife*, 503 F.2d 735, 743 (6th Cir.1974), stated that "this policy favoring the award of attorney fees has been recognized and applied by courts in actions under the Fair Housing Act." (Citations omitted.)

The Supreme Court addressed the role of "private attorneys general" in the enforcement of the Fair Housing Act in *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).[1] There the Court stated:

Since HUD has no enforcement powers and since the enormity of the task of assuring fair housing makes the role of the Attorney General in the matter minimal, the main generating force must be private suits in which, the Solicitor General says, the complainants act not only on their own behalf but also "as private attorneys general in vindicating a policy that Congress considered to be of the highest priority."

*Id.* at 211, 93 S.Ct. at 367.

Because the underlying policy behind section 3612(c) is to encourage private litigants to seek judicial relief for violations of their rights under the Fair Housing Act, courts have held that the financial inability requirement in the proviso of 3612(c) does not mean that a plaintiff must be indigent to recover attorney's fees. For example, in *Marr v. Rife*, 503 F.2d at 744, the Sixth Circuit stated that "we do not regard this caveat as limiting the award of attorney fees only to those of indigent status ...," citing *Sanborn v. Wagner*, 354 F.Supp. 291, 297 (D.Md.1973). *Accord, Smith v. Anchor Building Corp.*, 536 F.2d 231, 236, n. 9 (8th Cir.1976).

While the court's statement in *Marr* apparently referred to the financial status of an individual plaintiff, the same principle should apply when considering the financial status of a plaintiff that is an organization. Thus, the court concludes that the financial inability proviso does not limit the award of attorney's fees to only "indigent" organizations.

### B.

■ The evidence received at the hearing of December 24, 1984 shows that HCC is a nonprofit community organization with limited financial resources.[2] HCC's annual income for fiscal years 1978 through 1984 have averaged roughly $114,000 per year ranging from a high of $146,434 in fiscal year 1978 to a low of $98,564 in fiscal year 1981. While HCC's income sources vary somewhat from year to year, its consistent sources have been foundation grants, corporate donations, individual donations, phon-a-thon proceeds, heritage tour proceeds and city contracts. Federal and foundation grants, together with donations, comprised over half of HCC's income from fiscal years 1979 through 1981 and almost half of its income in the other years.

HCC's financial statements for fiscal years 1978 through 1984 show that an average of about 67 percent of HCC's annual expenditures are budgeted for personnel costs (salaries, employee benefits and workmen's compensation).[3] The larger expenses among HCC's remaining functional

---

1. In that case, the Court held that two tenants of an apartment complex who claimed they had been injured by their landlord's discrimination against nonwhites in that they had lost the benefits of living in an integrated community and suffered the disadvantages of being residents of a "white ghetto" had standing to sue under section 810(a) of the Civil Rights Act of 1968.

2. The evidence submitted includes the proposed budgets approved by HCC's Board of Trustees for fiscal years 1978 through 1985 and HCC's audited financial statements for fiscal years 1978 through 1984. HCC's fiscal year ends in May of each year.

3. Although the data is incomplete, the budgets for 1979 and 1980 indicate that HCC employed six people full time and two to three people half time.

expenses include duplicating, postage, rent, telephone, meeting expense and supplies.

A large proportion of HCC's income is in the form of restricted or earmarked funds, whose use "depended upon where they came from." (Tx. 27) Restricted funds made up an average of almost 50 percent of HCC's income for fiscal years 1978 through 1984. Further, HCC Executive Director Lana Cowell testified that HCC has a policy to use unrestricted funds available at the end of any fiscal year for "functional maintenance" or "operating expenses" for the first quarter of the next fiscal year.

Thus, the evidence shows that HCC is an organization with no guaranteed annual funding source, and that a large portion of its income is determined by the largess of several sources over which HCC has no control.[4] Based on all of the evidence, the court finds that HCC did not have the surplus funds that would have been necessary to finance fair housing litigation of this breadth. The court therefore determines that HCC "is not financially able to assume [its] attorney's fees" in this litigation.

### C.

■ The court further determines that the contingency nature of HCC's fee arrangement with its counsel does not preclude recovery of attorney's fees. The evidence received at the hearing of December 24, 1984 shows that HCC's arrangement with its attorneys, Avery Friedman and Kathryn Eloff,[5] was on a contingency fee basis. Defendants argue that because the only arrangement between HCC and its attorneys was a contingent fee arrangement, "HCC was able to proceed with the lawsuit without any financial obligation to its attorneys whatsoever." Because of this contingency arrangement, defendants

maintain that HCC is financially able to assume its attorneys' fees. Plaintiffs, on the other hand, argue that the contingent nature of its fee arrangement with its attorneys should not be used to defeat recovery.

Defendants rely on *Samuel v. Benedict*, 573 F.2d 580 (9th Cir.1978), in which the Ninth Circuit affirmed the denial of attorney's fees to a plaintiff who won a jury verdict of $2,000 compensatory and $500 punitive damages for violations of the Fair Housing Act, 42 U.S.C. §§ 3601–3631, and the Civil Rights Act of 1886, 42 U.S.C. § 1982. The court recognized that "[t]he concern of Congress in enacting § 3612(c) was that a litigant not be discouraged from bringing a civil rights suit because of the financial burden of the resulting legal fees." *Id.* at 581.

The court in *Samuel* reasoned that without the contingent fee arrangement, plaintiff would have had to bear the financial risk and therefore might not have pursued her lawsuit. *Id.* at 582. With a contingent fee arrangement, however, "[n]o funds would have been diverted from her income to pay for the litigation because her attorney would have suffered the loss." *Id.* The court stated that "[t]here would in short be no financial barrier to the litigation—the very purpose Congress sought to achieve." *Id.*

The *Samuel* court's analysis was shaped by the underlying purpose of section 3612(c): to prevent plaintiffs from being deterred from bringing suit to protect their Fair Housing Act rights because they cannot afford private counsel. This same focus also underpinned the court's analysis in *Hairston v. R & R Apartments*, 510 F.2d 1090 (7th Cir.1975), which was distinguished by the *Samuel* court.

---

**4.** The uncertain nature of HCC's income sources is illustrated by income from "school—community contracts," which was $51,285 in fiscal year 1978, $588 in fiscal year 1979, and zero thereafter. Similarly, HCC received a significant amount of income from federal grants before fiscal year 1980 but none in later years.

**5.** From February through May 1981, after Ms. Eloff had finished law school but before she was admitted to the bar, Ms. Eloff worked as a law clerk for HCC on this litigation. Subsequently, Ms. Eloff became employed with the City of Cleveland Heights. The court finds that from February through the time she was admitted to practice, Ms. Eloff worked as a volunteer.

In *Hairston,* the Seventh Circuit reversed a district court's denial of attorney fees to a plaintiff who was unable to bear the expense of the litigation and who was represented for free by a private legal services organization. The court noted that the policy behind section 3612(c) is to encourage individuals injured by racial discrimination to seek judicial relief, and stated that "[a]warding attorney fees where the plaintiff is unable to bear the expense of litigation even though the legal services are provided at no cost is consistent with and advances this policy." 510 F.2d at 1092. The court reasoned that if legal services are provided for free, there may be no direct barrier to bringing suit, but that

> if no fees are awarded, the burden of the costs is placed on the organization providing the services, and it correspondingly may decline to bring such suits and decide to concentrate its limited resources elsewhere, thereby curtailing the forceful application of the Act that Congress sought. Thus, the denial of fees in this situation indirectly cripples the enforcement scheme designed by Congress.

*Id.* The *Hairston* court therefore concluded that fees should be awarded even though the plaintiff had received free legal services.[6]

The *Samuel* court's conclusion that a contingency fee arrangement is an "excellent device" to encourage individuals to seek judicial relief assumes that an attorney would be willing to take the case solely on a contingent basis, without any recovery for attorney's fees. Thus, this conclusion is valid only for the type of case where there is enough chance of significant monetary recovery to attract competent counsel. The instant suit is not such a case. Given the breadth of the claims, the novelty of many issues, the difficulty of proving damages, and the relatively small chance of any significant monetary recovery, this litiga-

tion represents the type of suit in which a contingency fee arrangement may not be enough to attract private counsel. Hence, the instant case is analogous to the situation in *Hairston,* in that if no fees are awarded, private attorneys "may decline to bring such suits."

The court therefore concludes that the contingency fee arrangement between HCC and its counsel does not bar an award of attorney's fees under section 3612(c).

## II.

### A.

■ The evidence received at the hearing on December 24, 1984 shows that the financial position of plaintiff City stands in sharp contrast to that of plaintiff HCC. The City is a municipal corporation and has the power to raise revenue from taxes. The City's financial statements[7] show that the City's receipts come from a variety of sources, including the following: property taxes; municipal income taxes; other local taxes; state levied, shared taxes; intergovernmental aid; charges for services; fees, licenses and permits; interest earnings; special assessments; and fines and forfeits. The City's "total expenditure disbursements" from 1979 to 1983 average about $33 million per year.

More important than total size, however, is the fact that the City had available and used a special revenue source to finance this lawsuit. City Manager Richard Robinson testified that from 1979 through 1983 the City received from about $1.5 to $2.3 million per year in federal Community Development Block Grant (CDBG) funds. Robinson stated that out of these funds, the City Council approved a CDBG budget which appropriated a certain amount for the general category of "fair housing." Robinson testified that the City spent "a

---

6. To avoid any windfall to plaintiff, however, the court stated that the grant of fees should go directly to the legal services organization. *Hairston,* 510 F.2d at 1093.

7. The City's financial statements for 1979 through 1983 were received in evidence at the December 24 hearing.

great deal of money" prosecuting this lawsuit and that all of the moneys spent on this suit for the compensation of lawyers and all costs came from the CDBG fair housing funds.[8]

The testimony of City Manager Robinson also revealed that the City's attorneys, Law Director Donald Barclay and Kathryn Eloff, did not have any specific agreements with the City in connection with their work on this lawsuit, but both received a salary.[9] The City Council's salary ordinance authorized a salary range for various positions, and the exact salary was determined by the City Manager. The salary paid to the law director was to cover "normal business," defined by Robinson as preparing legislation, attending staff meetings, and supervising the work of the department. Robinson stated that the "normal business" generally took about 15 to 20 hours per week.

In addition to salary, a City Council ordinance authorized additional compensation for the law director and attorneys at "an overtime rate not to exceed $75 per hour for time spent in representing the City in court appearances and special projects over and above normal work hours as approved by the city manager." Robinson testified that the law director submits bills for Robinson's approval for any "extraordinary work." Although Robinson did not have at the hearing the invoices connected with this case, he testified that the law director was paid by the City for "whatever services or hours were expended by" him in connection with this lawsuit. Robinson did not know if Ms. Eloff had been paid any "extraordinary payments" for legal services rendered on this lawsuit.

Thus, the evidence shows that the City is clearly in a much different financial position than HCC. First, the City has the ability to raise millions of dollars in tax revenue. In addition, the City annually received federal CDBG funds in an amount which was over ten times HCC's entire annual expenditures. A portion of these federal funds were used to finance all of the City's expenses connected with this lawsuit, including compensation for its attorneys. Based on all of the evidence, the court finds that plaintiff City is "financially able to assume" its attorneys fees.

### B.

■ Nevertheless, plaintiff City argues that the financial inability proviso "relates only to the recovery of attorney fees and is not a limitation upon the award of costs to a prevailing plaintiff." Under section 3612(c), the court may award to a plaintiff "actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That said plaintiff in the opinion of the court is not financially able to assume said attorney's fees."

The first part of section 3612(c) speaks of "court costs and reasonable attorney fees" as separate items. The proviso, however, only mentions "said attorney's fees." Hence, the proviso may be read as applying only to the recovery of attorney's fees and not as a limitation on the recovery of costs in the case of a prevailing plaintiff. Given that the policy behind section 3612(c) is to encourage private litigants to seek judicial relief under the Fair Housing Act, see *su-*

---

8. One of the exhibits received at the December 24 hearing, a set of papers entitled "Hilltop Lawsuit—Financial Recap (As of March 10, 1983)," includes a page containing the following summary of moneys spent on this lawsuit by CDBG program year:

| | |
|---|---|
| Year 4 Hilltop Expenses - | $ 2,500.00 |
| Year 5 Hilltop Expenses - | 63,297.42 |
| Year 6 Hilltop Expenses - | 12,510.25 |
| Year 7 Hilltop Expenses - | 13,425.02 |
| Year 8 Hilltop Expenses - | 20,000.00 |
| Year 9 Hilltop Expenses - | 12,436.83 |
| TOTAL: | $124,169.52 |

9. As previously noted, Ms. Eloff at some point became an employee of the City of Cleveland Heights as a member of the Law Department. Robinson testified that she has been paid a salary since she began working for the City.

**14**

*pra* pp. 9–10, this court determines that the proviso limitation applies only to the recovery of attorney's fees. Thus, the City, as prevailing plaintiff, may recover those costs taxable under 28 U.S.C. § 1920.

### III.

Based on the foregoing, the court concludes that although both HCC and the City are prevailing plaintiffs, only HCC meets the financial inability test of section 3612(c). Therefore, only HCC may recover reasonable attorney's fees. Both HCC and the City, however, may be awarded costs taxable under 28 U.S.C. § 1920.

On April 9, 1985 at 9:00 a.m., the court will conduct a hearing to determine what fees are "reasonable" for the services rendered by HCC counsel. *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), provides guiding principles which will govern this court's determination. While the first step is to multiply the number of hours "reasonably expended" by a "reasonable hourly rate," *id.* at 433, 103 S.Ct. at 1939, in this case, in light of rulings previously made, the court must give careful consideration to the "important factor of the 'results obtained,'" *id.* at 434, 103 S.Ct. at 1940. At the hearing, the court will hear argument and receive testimony and other evidence that bears on all relevant factors.

IT IS SO ORDERED.